## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

Brian R. Della Rocca

9801 Washingtonian Blvd #710,

Gaithersburg, MD 20878

     Plaintiff,

v.

**Susan C. Lee**, in her official capacity as the Maryland Secretary of State

16 Francis Street, #1

Annapolis, Maryland 21401

    and

**Michael G. Summers**, in his official capacity as the Chairman of the Maryland State Board of Elections

151 West Street

Suite 200

Annapolis, Maryland 21401

    and

**Louis DeJoy**, in his official capacity as Postmaster General of the United States Postal Service

USPS Headquarters

475 L'Enfant Plaza, SW

Washington, DC 20260-0010

    Defendants.

**CIVIL ACTION**

**CASE NO. _____**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff **Brian R. Della Rocca** files this Complaint for Declaratory and Injunctive Relief against Defendants **Susan C. Lee**, in her official capacity as the Secretary of State for the State of Maryland, **Michael G. Summers**, in his official capacity as the Chairman of the Maryland State Board of Elections, and **Louis DeJoy**, in his official capacity as the Postmaster General of the United States Postal Service, and alleges as follows:

## NATURE OF THE CASE

1.      In the lead up to the 2020 elections, which included the election of the President of the United States of America, the United States (and the world) was in the midst of the Covid-19 pandemic which caused lawmakers to declare a national emergency.

2.      As a result of the pandemic and the resulting national emergency, states throughout the United States of America expanded their absentee ballot program to allow all citizens, regardless of need, to participate in the 2020 election by mail-in ballot.

3.      In the lead up to the election, numerous lawsuits were filed to prevent the use of mail-in ballots due, for the most part, to the likely inability for the United States Postal Service ("USPS") to keep up with demand during a time the USPS was experiencing cuts in its workforce and delivery hours/days.

4.      As a result, allegations of problems with the delivery of mail-in ballots by the USPS were rampant and continue, to this day, to be challenged. As time passes, the allegations are not being disproven but, in fact, many of the allegations have turned out to be true.

5.      These allegations include, but are not limited to, lost mail-in ballots (which were subsequently found after the elections), late delivery of mail-in ballots, improperly post-marked

mail-in ballots that were still allowed to proceed to their destination despite post-marks being provided on valid mail-in ballots, and fraudulent mail-in ballots being sent via USPS.

6.     Sadly, the problems with reliable service of mail-in ballots were drawn into politically motivated disputes despite the fact that the issue impacts parties of all political affiliations.

7.     With the 2024 election approaching, Maryland and other states have seen fit to allow any voter to cast his/her vote by mail-in ballot despite there being no public emergency, frequently referred to as universal mail-in voting.

## JURISDICTION AND VENUE

8.     Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

9.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

10.     This Court has personal jurisdiction over Defendant Louis DeJoy who is sued in his official capacity only.

11.     This Court has personal jurisdiction over Defendant Susan C. Lee who is sued in her official capacity only.

12.     This Court has personal jurisdiction over Defendant Michael G. Summers who is sued in his official capacity only.

13.     Venue is proper in the U.S. District Court for the District of Maryland pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiff's claims occurred there.

## THE PARTIES

14.     Plaintiff Brian R. Della Rocca is a U.S. citizen with an interest in protecting his rights as a voter in the United States of America. Plaintiff is a licensed attorney in the State of Maryland and is working to ensure that he and his fellow citizens can effectively exercise their right to vote for their chosen presidential nominee. Plaintiff is registered as an independent voter and has no affiliation with any political party. Plaintiff has requested a mail-in ballot for the 2024 election. As a mail-in voter, Plaintiff is directly harmed by the failures by the USPS and is specifically harmed by the loss of ballots being transported through the mail system and the ease in which fraud can be perpetrated through mail-in voting.

15.     Defendant Louis DeJoy is the Postmaster General of the United States Postal Service (USPS), a federal agency headquartered in Washington, D.C. with branches throughout the United States.

16.     Defendant Susan C. Lee is the Secretary of State for the State of Maryland and heads the agency that oversees voting in the State of Maryland.

17.     Defendant Michael G. Summers is the Chairman of the Maryland State Board of Elections which protects Maryland voters' rights to vote.

**STATEMENT OF FACTS**

***Facts Relevant to Plaintiff's Claims***

18.     On or about November 26, 2020, Jesse Morgan, a truck driver for trucking company Roads 10 Express, signed an affidavit attesting to hauling mail-in ballots from Bethpage, New York to Lancaster, Pennsylvania (the "Morgan Affidavit").

19.     Specifically, in the Morgan Affidavit, Jesse Morgan claimed that he hauled 24 bins of mail-in ballots from Bethpage, NY to Harrisburg, PA and then to Lancaster, PA. The Morgan Affidavit is attached as **Exhibit A**.

20.     In response, the USPS Office of the Inspector General ("OIG") investigated Jesse Morgan's claims and, during the January 6 Congressional Hearings, the results of that investigation were released to the public ("OIG Report"). OIG Report attached as **Exhibit B**.

21.     In the OIG Report however, the OIG concluded that, while Jesse Morgan ***did*** transport mail-in ballots from Bethpage, NY to Lancaster, PA, there were only 150 mail-in ballots present in the shipment.

22.     According to the report, the "Election Mail Log" in Bethpage, NY indicated only 150 mail-in ballots for the entire election season. These mail-in ballots were allegedly present in images of the ballots and not in a log form, as are used at other locations.

23.     As a result of the Morgan Affidavit and prior to the release of the OIG Report, John F. Moynihan ("Moynihan"), a seasoned investigator, began an investigation with Lawrence W. Doyle ("Doyle") into the allegations. Declarations of Moynihan and Doyle attached as **Exhibits C and D**.

24.     During his investigation, Moynihan spoke with numerous employees of the USPS including one senior postal inspector for the New York area who was familiar with the Bethpage,

NY postal facilities – one on Hicksville Road that handles first-class mail and the other on Grumman Road that handles non-first-class mail including parcels and packages.

25.    That senior postal inspector told the Plaintiff that the Grumman Road facility does not have the proper machines with imaging capabilities (referred to as an "Oregon Machine") since Grumman Road is a parcel distribution center and not a first-class mail facility.

26.    The senior postal inspector also noted that mail-in ballots, as they are first-class mail, should not have even been routed to the Grumman Road facility as all first-class mail are required to be imaged.

27.    Moynihan also spoke with other employees of the Grumman Road facility who assist with loading trucks (referred to as expediters) and the expediters told Moynihan and Doyle that there were numerous instances where mail-in ballots were received and, when superiors were asked what to do with them, the expediters were told to just load them onto the trucks. An expediter told Moynihan that they "did what we were told to get those ballots to their destination." This statement was made by the expediter who loaded the ballots onto Jesse Morgan's truck to Moynihan via text message.

28.    During that investigation, Moynihan spoke with various employees of the Bethpage facility and was told that, in fact, many mail-in ballots were flowing through the Bethpage mail facility – which is a package facility and is not equipped to receive first-class mail.

29.    Through Moynihan's investigation, he and Doyle learned that first-class mail passes through the Grumman Road facility despite that facility not being equipped to handle first-class mail.

30.    Even more disturbing is the fact that mail-in ballots pass through the Grumman Road facility thereby breaking the chain of custody required by the USPS of first-class mail.

31.     Plaintiff, with Moynihan and Doyle, filed numerous requests pursuant to the Freedom of Information Act ("FOIA"). In response to these requests, basic information was provided but a great deal of the information had been destroyed pursuant to the USPS' document destruction policies.

32.     During interactions with USPS relating to the Plaintiff's FOIA requests, Plaintiff told USPS counsel about the OIG Report and that it likely contains information Plaintiff was seeking.

33.     In response, IRS counsel allegedly looked into the information retained for the OIG Report but told Plaintiff's counsel that relevant information was not retained and that the OIG "backed into" the numbers alleged in the OIG Report.

34.     In a later interaction, Plaintiff again requested the information used to draft the OIG Report.  This time, Plaintiff got information from the USPS that was not disclosed previously.

35.     USPS has not explained to Plaintiff how the information produced was not available before but became available at another point.

36.     Plaintiff has also not received an explanation as to how USPS counsel determined that the OIG "backed into" the numbers presented in the OIG Report.

37.     The information provided by USPS to Plaintiff, while relevant, remains incomplete.

38.     To date, USPS has not shown actual evidence discrediting the Morgan Affidavit stating Jesse Morgan's experience carrying ballots from the Grumman Road facility to Lancaster, PA (via Harrisburg).

***Other Relevant Facts Showing Failures of USPS and Use of Mail-In Ballots***

39.     On August 23, 2020, the Washington Post published an article regarding the use of mail-in ballots in the primaries ("Washington Post Article").[1]

40.     According to the Washington Post Article, more than 534,000 mail-in ballots "were rejected during primaries across 23 states."

41.     The number of rejected ballots *in only 23 states* during the 2020 primaries "outstrips the nearly 319,000 mail and absentee ballots that were thrown out *nationwide* in the 2016 general election," according to the Washington Post Article.

42.     Further, the American Civil Liberties Union (ACLU) Voting Rights Project released an article on November 2, 2018, stating that signature match laws on mail-in ballots disproportionately impact voters "already on the margins" ("ACLU Article")[2]

43.     According to the ACLU Article, states can reject mail-in ballots if the person reviewing the mail-in ballot determines that the signature does not match the voter records.

44.     Not only can the voter's mail-in ballot be rejected but that voter will not even know that he/she has been disenfranchised, according to the ACLU Article.

45.     The ACLU Article correctly points out that the U.S. Constitution protects voters' due process rights and that "the concept of due process of law requires that all citizens be given fair notice and the opportunity to be heard before having one's rights taken away. The right to vote is a precious one that cannot be stolen from voters without due process."

46.     According to an article published by NBC4 in Los Angeles on November 4, 2016, the Los Angeles County Registrar sent 83 mail-in ballots to a single address ("NBC4 Article").[3]

---

[1] https://www.washingtonpost.com/politics/rejected-mail-ballots/2020/08/23/397fbe92-db3d-11ea-809e-b8be57ba616e_story.html

[2] https://www.aclu.org/news/voting-rights/signature-match-laws-disproportionately-impact-voters-already-margins

[3] https://www.nbclosangeles.com/news/politics/more-than-80-ballots-sent-to-san-pedro-apartment/106443/

47.     The NBC4 Article states that "all of the names on the ballots were different," and that the Registrar was unsure how the ballots were sent to the address and were investigating the cause.

48.     According to an article published by Fox11 News (Wisconsin) on September 23, 2020, three trays of mail, including absentee ballots, was found in a ditch near Appleton International Airport.[4]

49.     The New York Times reported on April 9, 2020, that "[t]hree tubs of absentee ballots that never reached voters were discovered in a postal center outside Milwaukee. At least 9,000 absentee ballots requested by voters were never sent, and others recorded as sent were never received. Even when voters did return their completed ballots in the mail, thousands were postmarked too late to count – or not at all."[5]

50.     Another New York Times Article, published on September 1, 2020, cited problems in Baltimore where postal officials allegedly "certified that they were clear of election and political mail daily" but an audit determined that such mail received on May 12, 2020, actually sat unprocessed for five days resulting in about 68,000 pieces of election and political mail not being delivered on time.[6]

51.     On July 27, 2023, Erich J. Speckin released an amended independent report about mail-in voting in Detroit, Michigan (the "Speckin Report"). Speckin Report attached as **<u>Exhibit E</u>**.

---

[4] https://fox11online.com/news/local/mail-found-in-ditch-in-greenville
[5] https://archive.li/bhE2p#selection-630.0-805.28
[6] https://archive.li/CH5YM

52.     The Speckin Report reported, among other things, that there were numerous mail-in ballots found that had no application on file.[7]

53.     The Speckin Report also found notations where the names on the mail-in ballots did not match the "poll book."

54.     The Speckin Report determined that, based on their own investigation, approximately 8% to 20% of mail-in ballots had no application requesting the ballot, a clear violation of voting protocol in Detroit, Michigan and a clear indication of voter fraud.

55.     The Delaware House of Representatives recently voted against an amendment to Delaware's constitution that would allow "no excuse absentee voting" which is, essentially, universal mail-in voting.[8]

56.     Currently, 28 states allow "no-excuse" mail-in voting with eight of those states sending mail-in ballots to voters even if not requested.[9]

57.     According to a report by John R. Lott, Jr., Ph.D., many countries in the world do not even allow mail-in voting due to the ease with which voter fraud can take place and the difficulty in uncovering that fraud.[10]

58.     Most, if not all, of the issues present during the 2020 elections continued during the 2022 elections and the conditions that led to those issues have not been adequately resolved in anticipation of the 2024 election.

**A.  U.S. Postal Service**

**(1) Lack of Reliability**

---

[7] According to the Speckin Report, in order to receive a mail-in ballot, an application must have been received by the board of elections.
[8] https://www.delawarepublic.org/politics-government/2024-06-13/house-fails-to-pass-no-excuse-and-permanent-mail-in-voting-early-voting-constitutional-amendment
[9] https://www.csmonitor.com/USA/Politics/2024/0517/election-integrity-voting-mail-ballots-trust
[10] https://intergovernmental.pasenategop.com/wp-content/uploads/sites/14/2022/04/vote-fraud.pdf

59.     The USPS is renowned for its lack of reliability.

60.     According to a 2021 Government Accountability Office report, in 2020, USPS received 10.7 million residential customer complaints of which 69% (7.383 million) were related to missing or delayed packages ("GAO 2021 Report").[11]

61.     The statistics in the GAO 2021 Report were only known because the mail was expected to be received and did not arrive.

62.     Since Boards of Elections have no way of knowing if voters who requested mail-in ballots actually returned them and the USPS tracking mechanisms are flawed, it is difficult to know how many mail-in ballots are lost in the mail.

63.     There is no adequate tracking mechanism in place for first-class mail that allows voters to track their mail-in ballot to confirm it was actually received by the Board of Elections.

64.     According to reports, approximately 31.9% of voters voted by mail in the 2022 election.[12]   In 2022, there were 161.4 million registered voters in the US.[13] Therefore, if all of the registered voters actually voted, approximately 51,486,600 voters cast their vote by mail-in ballot. The public (and the USPS) has no idea how many of these mail-in votes were lost in the mail system.

65.     During the 2020 and 2022 elections, Federal Judges had to order the USPS to sweep their facilities to ensure that all mail-in ballots had been delivered.[14]

---

[11] https://www.gao.gov/assets/gao-21-465-highlights.pdf
[12] https://www.npr.org/2023/07/03/1185843074/mail-voting-is-still-pretty-popular-even-without-the-pressure-of-the-pandemic
[13] https://www.statista.com/statistics/273743/number-of-registered-voters-in-the-united-states/
[14] *State of Washington v. Trump*, No. 1:20-cv-03127, (E.D. Wash. 2020); *VOTE FORWARD et al v. DEJOY et al*, No. 1:2020-cv-02405 (D.D.C. 2020)

66.     According to a September 29, 2021, report by the non-profit, More Perfect Union, the reliability of the USPS under Postmaster DeJoy is steadily getting worse ("More Perfect Union Report").[15]

67.     Postmaster DeJoy's plans of consolidating processing facilities and closing others have allegedly been paused temporarily.

68.     However, according to the More Perfect Union Report, the changes already implemented by Postmaster DeJoy have caused significant delays in the delivery of the mail.

69.     On July 30, 2024, the OIG issued a new report finding failures with "operational risks that can delay timely processing and delivery of election mail" ("OIG 2024 Report").[16]

70.     The OIG 2024 Report cited "inconsistent election day coordination, a lack of processes to segregate Election Mail out of Postal Automated Redirection Systems (PARS) Mail, and confusion around postmarking" resulting in Election Mail "failing to make it to the board of election offices on time to be counted."

### (2) Failure to Maintain Records

71.     The USPS fails to maintain records for an adequate period of time which prevents investigators from tracing the chain of custody of mail-in ballots.

72.     According to responses to multiple requests under the Freedom of Information Act ("FOIA"), information with regards to specific cargo such as mail types, weights, etc. is only maintained for 30 days.

73.     Federal law requires that "officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for President, Vice President, presidential elector, Member of the Senate, Member of

---

[15] https://perfectunion.us/louis-dejoy-usps-slowing-mail-service/
[16] https://justthenews.com/sites/default/files/2024-08/USPS-OIG-ElectionMailReport.pdf

the House of Representatives or Resident Commissioner of the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" *See 52 USC § 20701.*

74.     An "officer of election" means "any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for the office of President Vice President, presidential elector, Member of the Senate, Member of the House of Representatives or Resident Commissioner of the Commonwealth of Puerto Rico." *See 52 USC § 20706.*

75.     The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *See 1 USC § 1.*

76.     By virtue of the widespread use of mail-in ballots, the USPS is an officer of election and is, therefore, mandated to maintain records of mail-in ballots passing through its facilities for a period of twenty-two (22) months.

77.     As discovered by the Plaintiff, first-class mail is not always imaged while in transit so there is frequently no proof of where the mail is at any point in time.

78.     Additionally, the "election mail logs" are informal and incomplete methods of "tracking" mail-in ballots flowing through the mail system.[17]

79.     In the OIG 2024 Report, the problems with maintaining records are still cited as a problem under its finding that there is "non-compliance with election mail policy and procedures."

---

[17] Election mail logs are frequently handwritten logs with minimal information.

80.     The failures of compliance with election mail policies and procedures cited in the OIG 2024 Report show that "over half of the delivery units and processing facilities [] visited were not properly completing the all clear certifications or maintaining the Election and Political Mail Logs."

### (3) Chain of Custody Problems

81.     The Morgan Affidavit and Moynihan and Doyle's interviews with USPS employees show problems with the USPS chain of custody with mail-in ballots.

82.     According to a senior postal inspector, first-class mail should have never been routed through the Grumman Road facility, which is a package processing facility.

83.     According to other employees at the Grumman Road facility, mail-in ballots were loaded onto trucks on numerous occasions raising concerns among the employees who were told by senior level employees to just load them on the trucks. One employee told the Plaintiff that "we did what we were told to get those ballots to their destination."

84.     Once a mail-in ballot is placed in the mailbox, there is no guarantee it will arrive at its destination.

**B.  Use of Mail-In Ballots Disenfranchises Voters**

85.     Voters participating by mail have no way of knowing whether their votes were received by the respective Boards of Election.

86.     Further, the Speckin Report shows that, even if the Board of Elections receives a voter's mail-in ballot, there is no guarantee it will be counted.

87.     Along the same lines as the information cited in the Speckin Report, according to the Stanford Institute for Economic Policy Research, "[h]istorically, mail-in ballots are rejected at higher rates than in-person votes."[18]

88.     Therefore, the chances of a voter's voice being heard through his/her vote is significantly diminished if the voter chooses to vote by mail.

89.     Mail-in ballots are easy to replicate, and systems are not in place to thoroughly root out fraudulent ballots.

90.     As a result, in-person voters run the risk of the dilution of their vote due to the potential for fraud in the mail-in ballot system.

91.     There is no fail-safe way to prevent fraudulent ballots from being mailed and counted under current law.

**C.  Maryland's Election Laws Cede State Authority of Elections to a Federal Agency**

92.     The "Elections Clause" of the U.S. Constitution enables the states to regulate the times, places, and manner of holding elections. *US Const. Art. I § 4, Cl. 1.*

93.     The Elections Clause is an example of the federalist-type government at work in the United States of America.

---

[18] https://siepr.stanford.edu/publications/policy-brief/how-does-vote-mail-change-american-elections

94.    By granting authority to the USPS, Maryland  is ceding its authority to regulate elections to the Federal government.

**D.  Mail-In Ballots Cause Widespread Election Distrust**

95.    The 2020 Presidential Election shows that where voters do not trust the results of an election, the certification of such election can lead to the erosion of a democracy and potentially violence.

96.    The 2020 Presidential Election was the first presidential election where voters were able to vote by mail without needing a valid excuse, as was the case in prior elections via "absentee ballots."

97.    The structural problems at the USPS do not lend themselves to a reliable ballot delivery service.

98.    The USPS does not maintain adequate records to serve as a conduit for voters' ballots.

99.    The USPS, a federally funded agency, should not serve in the capacity of a poll worker or any other type of election "middleman."

100.    The USPS serves under the authority of the President of the United States and should not serve as the "middleman" for a Presidential election.

101.    The USPS has proven so unreliable that the general public cannot be confident in the chain of custody for mail-in ballots.

102.    Without confidence in the election process, the United States will fall farther away from its founding democratic principles.

103.    Most democratic nations throughout the world do not allow residents to vote by mail. The countries include, but are not limited to, France, Mexico, Belgium, Sweden, Italy, Japan

(residents can vote by mail under certain conditions), Israel, Morocco, Tunisia, Argentina, Chile, Brazil, Colombia, Costa Rica, Dominican Republic, Ecuador, Honduras, Jamaica, Panama, Paraguay, Peru, Suriname, Trinidad and Tobago, and Uruguay.[19]

104.    The United States should not allow universal mail-in voting due to the proven incompetence of the USPS and the obvious potential for disenfranchisement of voters and increased likelihood of voter fraud.

<u>COUNT I</u>
**First and Fourteenth Amendment**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Vote**

105.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

106.    Under the Anderson-Burdick balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the Plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

107.    Unless Plaintiff is granted the relief requested herein, thousands of Maryland voters' rights to vote, including Plaintiff's right to vote, will be severely burdened (if not wholly eliminated) in the upcoming November 2024 presidential election.

---

[19] https://www.snopes.com/fact-check/countries-mail-voting-banned/

## COUNT II
**Due Process**
**U.S. Const. XIV, 42 U.S.C. § 1983**
**Denial of Procedural Due Process**

108.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

109.    The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of…liberty…without due process of law." U.S. Const. Amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976); *Nozzi v. Hous. Auth. Of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015). Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F. 3d at 1192-93. Second, "courts must consider the 'fairness and reliability' of the existing procedures and the probable value, if any, of additional procedural safeguards.'" *Id*. at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures." *Id*. (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quotation and citation omitted).

110.    Maryland's procedures for voting, particularly mail-in voting, must comport with due process.  *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id*.; *see also Saucedo v. Gardner*, 335 F. Supp 3d 202,

217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted").

111.    "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)).

112.    Under current circumstances, there is little question that Maryland's election process and, in particular, its widespread use of mail-in ballots, is fundamentally unfair.  The nature of the interest at stake in this case – the right to vote and to have that vote count – is the most precious liberty interest of all because it is preservative of all other basic civil and political rights.

113.    The challenged laws threaten to deprive Plaintiff and all Maryland voters of this right in the upcoming election. Given the unprecedented situation at hand, Maryland must establish adequate procedures to ensure that voters have a reliable, fair, effective, and safe method to cast their ballots and to ensure the ballots have been imaged and counted in the November 2024 election.  Because the challenged laws are markedly inadequate in all of these respects, and substitute procedures are readily available to protect voters' rights with minimal burden to the State, the challenged laws violate Plaintiff's and other Maryland voters' procedural due process rights.

<u>**COUNT III**</u>
**Equal Protection**
**U.S. Const. XIV, 42 U.S.C. § 1983**
**Burden on the Fundamental Right to Vote**

114.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

115.    Maryland's reliance on the USPS to reliably cast the vote of those choosing to vote by mail places an undue burden on the right to vote of Maryland citizens.

116.    Voting in person guarantees that the vote of a person has been cast and will be counted.

117.    Voting by mail only guarantees that the ballot was placed into the mail stream <u>not</u> that it was received by the Board of Elections and counted.

118.    The USPS has no mechanism in place to track the mail-in ballots providing assurances to voters that his/her vote has been counted.

119.    The USPS cannot guarantee that the mail-in ballot will be delivered to the Board of Elections.

120.    Even if the mail-in ballot is received by the Board of Elections, statistics show that it is more likely to be rejected than in-person votes.

121.    The 2024 OIG Report shows that little progress has been made at the USPS since mail-in voting has become widespread.

122.    There is a greater chance of fraud being perpetrated through the use of fraudulent mail-in ballots.

123.    The proven failures of the USPS, the lack of action to improve on those failures, and the increased likelihood of fraudulent activity unduly burdens the Plaintiff's and other Maryland voters' fundamental right to vote.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

124.    Declaring that Maryland's reliance on the United States Postal Service to deliver the ballots of its citizens is unconstitutional in violation of the First and Fourteenth Amendments of the United States Constitution and a violation of the Maryland Constitution;

125.    Enjoining Defendants Lee and Summers and their respective agents, officers, employees, and successors, and all persons acting in concert with them, from allowing no-excuse mail-in voting until it can be shown that the United States Postal Service can adequately delivers all mail-in ballots to the boards of elections around the state;

126.    Enjoining Defendant USPS from participating in the collection and delivery of mail-in ballots;

127.    Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

128.    Granting such other relief as the Court deems just and proper.

Respectfully submitted this 21st day of August, 2024.

By:     */s/ Glen K. Allen*　　　　　　　　
Glen Allen Law
5423 Springlake Way
Baltimore, MD 21212
Phone: 410-802-6453
Email: GlenAllenLaw@protonmail.com

*Attorney for Plaintiff*